UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| KEVIN HAMPTON, | ) |
| Petitioner, | ) ) ) |
| v. | ) Case No. 1:12-cv-350-TWP-DKL |
| KEITH BUTTS, | ) ) ) |
| Respondent. | ) ) |

**ENTRY DISCUSSING PETITION FOR WRIT OF HABEAS
CORPUS AND DENYING CERTIFICATE OF APPEALABILITY**

For the reasons explained in this Entry, the petition of Kevin Hampton ("Mr. Hampton") for a writ of habeas corpus must be **DENIED** and the action dismissed with prejudice. In addition, the Court finds that a certificate of appealability should not issue.

**I. NATURE OF THE CASE**

Mr. Hampton seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254(a).

**II. PARTIES**

Mr. Hampton is an inmate confined at a state prison in Indiana. The respondent, Keith Butts, is Mr. Hampton's custodian, sued in his official capacity as a representative of the State of Indiana.

**III. PROCEDURAL BACKGROUND**

Mr. Hampton was convicted in 2006 in Vigo County, Indiana of murder, rape, and criminal deviate conduct. His convictions were affirmed on direct appeal in *Hampton v. State,* 873 N.E.2d 1074 (Ind.Ct.App. 2007) (*Hampton I*). The trial court's denial of Mr. Hampton's petition for post-conviction relief was affirmed on appeal in *Hampton v. State*, 936 N.E.2d 1274 (Ind.Ct.App. 2010) (*Hampton II*). The Indiana Supreme Court granted Mr. Hampton's request

for transfer to the Indiana Supreme Court. The Indiana Supreme Court vacated the Indiana Court of Appeals' opinion affirming the trial court's denial of the petition for post-conviction relief, but affirmed the post-conviction court's judgment denying Mr. Hampton's petition for post-conviction relief. *Hampton v. State*, 961 N.E.2d 480 (Ind. 2012) (*Hampton III*). This action followed.

## IV. STATEMENT OF FACTS AND CLAIM

The evidence relating to Mr. Hampton's offenses as set forth at direct appeal is as follows:

> On May 18, 2000, D.L. invited some friends to her home in Terre Haute to play cards, listen to music, and drink beer. At some point during the evening, D.L. and a friend—Courtney Smith—walked next door and obtained some marijuana from a neighbor. Hampton was at the residence at the time. Thereafter, D.L. and Smith visited some other friends at various locations in Terre Haute.
>
> D.L. returned home the following morning, and one of her friends, Justin Morrison, telephoned D.L. around 2:30 a.m. to find out whether she had returned safely. At some point during the conversation, D.L. told Morrison that she heard a knock on her door and that she would talk to him later.
>
> At approximately 11:30 a.m., Smith and Ashley Potter went over to D.L.'s residence. When Smith walked into D.L.'s bedroom, she noticed that D.L. was "sprawled out on the bed [and] naked from the waist down." They decided not to awaken D.L., so they left the house. However, Smith and Potter returned to D.L.'s house later that afternoon. Smith decided to take a shower and she observed some broken glass in the bathroom sink. After showering, Smith walked into D.L.'s bedroom and tried to awaken her. Smith noticed that a blow dryer "was in [D.L.'s] vaginal area." D.L.'s head was lying off the bed, and Smith decided to pull a comforter over D.L. However, she noticed that D.L.'s feet and legs were discolored. She touched one of D.L.'s arms and observed that it was cold. Smith then determined that D.L. was dead. Smith walked around to the other side of the bed and noticed that D.L.'s jeans had been tied around her neck. Smith also observed that a telephone headset was lying halfway beneath D.L.'s body. The phone cord was not connected, and one end of the cord had been ripped out of the wall. Smith also noticed that D.L. was still wearing the shirt she had worn the previous evening. Smith then walked over to a neighbor's house and called the police.

> When Dr. Roland Kohr performed an autopsy on D.L., he observed that a blow dryer had been inserted four to five inches into D.L.'s vagina. D.L.'s tongue was also protruding, a condition that is "commonly seen in association with ligature strangulations because of the upward pressure that's maintained on the neck, which causes the laryngeal and tongue-type structures to be pushed upward and outward." Dr. Kohr also observed that D.L.'s eyes were hemorrhaged, which suggested that D.L. may have been smothered before her jeans were wrapped around her neck. A rape kit was collected, and a vaginal swab taken from D.L. indicated the presence of semen. As a result, a DNA profile was developed and entered into the FBI's national index system.
>
> Dr. Kohr concluded that the cause of D.L.'s death was ligature strangulation and was of the opinion that the sexual intercourse had occurred prior to D.L.'s death. Dr. Kohr also determined that the hairdryer was inserted shortly after D.L.'s death. On March 17, 2005, the FBI found that Mr. Hampton's DNA matched the profile that had been entered into the system.
>
> On June 12, 2005, Hampton was charged with murder, felony murder, rape, and criminal deviate conduct.
>
> * * *
>
> Hampton was found guilty as charged. At a sentencing hearing that was conducted on December 20, 2006, the trial court vacated the conviction for felony murder. Hampton was then sentenced to sixty-five years for murder, twenty years for rape, and twenty years for criminal deviate conduct. The trial court ordered the sentences for rape and criminal deviate conduct to run concurrently with each other and consecutively to the sentence for murder. The trial court also ordered the aggregate sentence to run consecutively to a forty-year sentence that Hampton was already serving in an unrelated matter. In arriving at the sentence, the trial court identified Hampton's lengthy prior criminal history and the nature and circumstances of the crimes as aggravating factors.

*Hampton I,* at pp. 1076-78.

Mr. Hampton seeks habeas corpus relief based on his claim that appellate counsel was ineffective in failing to raise on direct appeal that the trial court erroneously refused over defense objections a reasonable theory of innocence instruction.

## V. APPLICABLE LAW

A federal court may grant habeas relief only if the petitioner demonstrates that he is in

3

custody "in violation of the Constitution or laws . . . of the United States."  28 U.S.C. § 2254(a) (1996).  The Court of Appeals has reviewed the standard to be applied here:

> When a state court has ruled on the merits of a habeas claim, our review is circumscribed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  *See* 28 U.S.C. § 2254(d); *Harrington v. Richter,* 131 S. Ct. 770, 783–84, 178 L.Ed.2d 624 (2011).  Under AEDPA, we may grant relief only if the state court's decision on the merits "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(1) and (2).  Plainly stated, these are demanding standards.  This Court has recognized that federal courts should deny a habeas corpus petition so long as the state court took the constitutional standard "seriously and produce[d] an answer within the range of defensible positions." *Mendiola v. Schomig,* 224 F.3d 589, 591–92 (7th Cir. 2000).

*Atkins v. Zenk*, 667 F.3d 939, 943-44 (7th Cir. 2012).  "Under AEDPA, federal courts do not independently analyze the petitioner=s claims; federal courts are limited to reviewing the relevant state court ruling on the claims."  *Rever v. Acevedo,* 590 F.3d 533, 536 (7th Cir. 2010).  "The habeas applicant has the burden of proof to show that the application of federal law was unreasonable."  *Harding v. Sternes,* 380 F.3d 1034, 1043 (7th Cir. 2004) (citing *Woodford v. Visciotti,* 537 U.S. 19, 25 (2002)).

A defendant has a right under the Sixth Amendment to effective assistance of counsel at trial.  *Strickland v. Washington,* 466 U.S. 668, 687 (1984).  To establish ineffective assistance of counsel under *Strickland,* the petitioner must show that counsel's performance was deficient and that the deficient performance prejudiced him.  *Id.*  For a petitioner to establish that "counsel's assistance was so defective as to require reversal" of a conviction or a sentence, he must make two showings: (1) deficient performance that (2) prejudiced his defense.  *Id.,* at 687.

With respect to the first prong, "[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms."  *Wiggins v. Smith,* 539 U.S. 510,

4

521 (2003) (quoting *Strickland,* 466 U.S. at 688). In determining whether counsel's performance was constitutionally deficient, the court's review of counsel's performance is highly deferential, and the petitioner must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. *Davis v. Lambert,* 388 F.3d 1052, 1059 (7th Cir. 2004). With respect to the prejudice requirement, the petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 694.

The standard for judging a claim of ineffective assistance of counsel is the same for both trial and appellate lawyers. *Matire v. Wainwright,* 811 F.2d 1430, 1435 (11th Cir. 1987). An appellate counsel's performance is deficient if he or she fails to argue an issue that is both obvious and clearly stronger than the issues raised. *Lee v. Davis,* 328 F.3d 896, 900-01 (7th Cir. 2003). To establish the *Strickland* prejudice prong, a defendant must show that there is a reasonable probability that appellate counsel's failure to raise an issue would have resulted in the reversal of his conviction or an order for a new trial. *Id.*, at 901 (for a claim to support relief, there must be a reasonable probability that the issue not raised would have altered the outcome of the appeal).

The foregoing outlines the straightforward features of *Strickland*'s two-prong test. In the context of a case such as Mr. Hampton presents, however, the AEDPA raises the bar. "The standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." *Harrington v. Richter*, 131 S. Ct. 770, 788 (2011) (internal and end citations omitted). "When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that

5

counsel satisfied *Strickland's* deferential standard." *Id.*

When the AEDPA standard is applied to a *Strickland* claim, the following calculus emerges:

> The question is not whether a federal court believes the state court's determination under the *Strickland* standard was incorrect but whether that determination was unreasonable – a substantially higher threshold. And, because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard.

*Knowles v. Mirzayance,* 129 S. Ct. 1411, 1420 (2009) (internal citations and quotations omitted).

Mr. Hampton claims that his appellate counsel was ineffective in failing to raise on direct appeal the argument that the trial court erroneously refused over defense objections an instruction that, "[w]here proof of guilt is by circumstantial evidence only, it must be so conclusive in character and point so surely and unerringly to the guilt of the accused as to exclude every reasonable theory of innocence" because the DNA evidence was not direct but circumstantial evidence. The Indiana Supreme Court granted transfer and reviewed this claim. In doing so, the Indiana Supreme Court explained that:

> Application of our analysis today leads us to conclude that the DNA evidence in the present case should be considered as circumstantial and not direct evidence of the defendant's conduct comprising the physical components of each of the charged criminal offenses (*actus reus*). On the other hand, such focus upon *actus reus* has not been the prevailing basis of prior Indiana case law, which had usually found the "reasonable theory of innocence" instruction properly rejected when one element of criminal offenses has been proven by direct evidence. Under such line of authority, the rejection of the instruction would not have been error in the present case because of the direct evidence in this case proving that the victim was raped, murdered, and criminally sexually battered by someone, or the DNA direct evidence identifying the defendant as having a prior involvement with the victim. The existing state of the law could have led the defendant's appellate counsel to conclude that there was little if any merit in pursuing on appeal the refusal of the "reasonable theory of innocence" instruction. Due to past variations in application of the "proof of guilt" language in the "reasonable theory of innocence" instruction, the law on this issue was unfavorable to the defendant at the time of his trial and direct appeal.

*Hampton III,* at 494-95.  The Indiana Supreme Court then concluded, "[g]iven the facts and the unfavorable state of the law, the defendant's appellate counsel did not fail to raise a strongly availing appellate issue by failing to challenge the trial court's rejection of the 'reasonable theory of innocence' instruction, and thus the denial of post-conviction relief was not erroneous." *Id*., at p. 18.

Mr. Hampton argues that "the [I]ndiana Supreme Court's factual conclusion that appellate counsel made a strategic choice [to] not pursue the issue is pure speculation." However, Mr. Hampton does not overcome the presumption that his appellate counsel's action may be considered sound trial strategy.  *See Davis v. Lambert*, 388 F.3d at 1059.

This result in *Hampton III* was not an objectively unreasonable application of *Strickland's* performance prong, and hence will not support relief under § 2254(d)(1).  As the foregoing shows, the Indiana Supreme Court in *Hampton III* took the constitutional standard seriously and produced an answer within the range of defensible positions.  Under the AEDPA, therefore, Mr. Hampton's claim of ineffective assistance of counsel on appeal does not support the award of habeas corpus relief.

## VI.  CONCLUSION

This Court has carefully reviewed the state record in light of Mr. Hampton's claim and has given such consideration to this claim as the limited scope of its review in a habeas corpus proceeding permits.  The deference due to state court decisions "preserves authority to issue the writ in cases where there is no possibility fair-minded jurists could disagree that the state court's decision conflicts with [Supreme Court] precedents." *Harrington v. Richter,* 131 S. Ct. 770, 786 (2011).  Mr. Hampton's habeas petition does not present such a situation.

Mr. Hampton's petition for a writ of habeas corpus [Dkt. 1] is therefore **DENIED.**

Judgment consistent with this Entry shall now issue.

## **CERTIFICATE OF APPEALABILITY**

Pursuant to Federal Rule of Appellate Procedure 22(b), Rule 11(a) of the *Rules Governing § 2254* proceedings, and 28 U.S.C. § 2253(c), the Court finds that Mr. Hampton has failed to show that reasonable jurists would find "it debatable whether the petition states a valid claim of the denial of a constitutional right." *Slack v. McDaniel,* 529 U.S. 473, 484 (2000). The Court therefore **DENIES** a certificate of appealability.

SO ORDERED.

Date: 01/24/2013

_____
Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

Kevin Hampton, #900142
Pendleton Correctional Facility
4490 West Reformatory Road
Pendleton, Indiana  46064

Henry A. Flores, Jr.
Office of the Indiana Attorney General
henry.flores@atg.in.gov